### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Francisco Venue

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:    0971 3:16CR00484-001 CRB** |
| **SEAN KRISHANMAKOTO** | ) | |
| **SHARMA** | ) | |

**Prepared for:**      The Honorable Charles R. Breyer
                       Senior United States District Judge

**Prepared by:**       Emily P. Libby
                       U.S. Probation Officer Specialist
                       Oakland, CA
                       Work: (510) 637-3616
                       Fax:   (415) 581-7453
                       emily_libby@canp.uscourts.gov

**Assistant U.S. Attorney**                    **Defense Counsel**
Cynthia  Frey                                  Edwin Ken Prather  (Appointed)
150 Almaden Boulevard, Suite 900               461 Bush Street, Suite 350
San Jose, CA 95113                             San Francisco, CA 94108
(408) 535-5061                                 (415) 881-7774
cynthia.frey@usdoj.gov                         edwin@pratherlawoffices.com

**Sentence Date:**     November 28, 2017 10:00 AM

**Offense:**           **Count 1**:
                       Transmission of a Program, Information, Code, and Command to Cause
                       Damage to a Protected Computer
                       18 U.S.C. § 1030(a)(5)(A)
                       Not more than 10 years imprisonment/$250,000 fine
                       (Class C Felony)

**Release Status:**    Released on bond

**Detainers:**         None

**Codefendants:**      None

Date Report Prepared:  October 24, 2017          Date Report Disclosed: January 3, 2018

Re:  Sharma, Sean (3128133)                                                                    Page 2

**Identifying Data:**



| | |
|---|---|
| **Date of Birth:** | July 16, 1990 |
| **Age:** | 27 |
| **Race:** | Asian |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |

| | |
|---|---|
| **SSN#:** | 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 |
| **FBI#:** | 5V3H6T5KV |
| **USM#:** | 74336-112 |
| **State ID#:** | None |
| **ICE#:** | None |
| **PACTS#:** | 3128133 |

| | |
|---|---|
| **Education:** | Master's Degree |
| **Dependents:** | 0 |
| **Citizenship:** | U.S. Citizen |
| **Immigration Status:** | U.S. Citizen |
| **Country of Birth:** | United States |
| **Place of Birth:** | CA |

**Legal Address:**     381 Meadow Grove Street
                       La Cañada Flintridge, California
                       91011

**Residence Address:**  Same

**Alias(es):**          None

**Alternate IDs:**      None

***Restrictions on Use and Redisclosure of Presentence Investigation Report.*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and  federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

Re:  Sharma, Sean (3128133)                                                                 Page 3

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.     On December 1, 2016, a single count Indictment was filed in the Northern District of California, charging the defendant, Sean Krishanmakoto Sharma with a violation of 18 U.S.C. §§ 1030(a)(5)(A) and (c)(4)(A)(i)(I) – Transmission of a Program, Information, Code, and Command to Cause Damage to a protected computer.

2.     On July 5, 2017, the defendant pled guilty to the Indictment. Judgment and Sentencing are currently set for January 16, 2018 at 10:00 a.m., before the Honorable Charles R. Breyer, Senior United States District Judge.

3.     The written Plea Agreement, filed pursuant to Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure, is enclosed for the Court's review. According to the Plea Agreement, the defendant and the Government agree to the following Sentencing Guidelines calculations:  Base Offense Level six pursuant to USSG §2B1.1(a)(2), a six level enhancement pursuant to USSG §2B1.1(b)(1)(D), because the loss amount was between $40,000 and $95,000, a two level enhancement pursuant to USSG §2B1.1(b)(2)(A)(i), because there were more than 10 victims, a four level enhancement pursuant to USSG §2B1.1(b)(18)(A)(ii), because the defendant was convicted of a violation of 18 U.S.C. § 1030(a)(5)(A), and a three level reduction pursuant to USSG §3E1.1, for Acceptance of Responsibility, for an adjusted offense level of 15. The parties have not reached an agreement regarding the defendant's Criminal History Category. The undersigned officer is in agreement with the proposed guideline calculations as set forth in the Plea Agreement. As part of the Plea Agreement, the defendant agreed to pay restitution of no less than $58,100. The defendant also agreed to an expanded search condition, which includes electronic devices.

4.     The defendant made an initial appearance on December 16, 2016, before the Honorable Jacqueline Scott Corley, United States Magistrate Judge. The defendant was released on an unsecured bond following his court appearance. He is on supervision with United States Pretrial Services in the Central District of California.

### The Offense Conduct

5.     The following information was provided by the United States Attorney's Office, which included investigative reports prepared by the Federal Bureau of Investigations (FBI). Further details were provided by the case agent on October 20, 2017.

6.     According to the FBI reports, on December 3, 2014, the Chief Executive Officer (CEO) of Chatango, a San Francisco based software company that provides online chat services for third-party websites, contacted the FBI regarding a series of Denial of Service (DDoS) attacks that occurred on multiple occasions. A DDoS attack is a cyber-attack, where an individual makes a network or website temporary unavailable to other users. Generally in this type of attack, a large amount of traffic is sent to a targeted website in an attempt to overwhelm the server, which then causes the site to shut down and be temporarily unavailable to legitimate users.

7.      Chatango's CEO conducted a preliminary investigation prior to contacting the FBI. On November 6, 2014, one of Chatango's customers, Anilinkz.com was the target of a DDoS attack. Because Anilinkz used DDoS protection services, the attack was re-directed to Chatango. On November 20, 2014, the company received an anonymous message regarding the attack on Anilinkz. The message was posted anonymously and no information was available about the user, except for the user's Internet Protocol (IP) Address.

8.      From November 27, 2014 until December 10, 2014, Chatango was the target of a series of DDoS attacks. The CEO also continued to receive anonymous postings about the attacks. One of the postings read:

> "Congrats I'm getting my phd in comp sci general, while killing this site and chatango notice how I sent anilinkz to go down in intervals? That's to bypass ur ddos protection. along with 6 other asshole admin sites"

9.      Chatango provided the FBI with the IP addresses that had sent the anonymous messages. The FBI used an investigative tool to obtain information about those IP addresses. The FBI was able to determine that the IP addresses were managed by Privax, Ltd., which was a virtual private network service provider based in the United Kingdom. Privax provided the FBI with records that showed that the defendant was the user of one of the IP addresses. Records obtained from Charter Communications internet provider also showed that the IP address was assigned to the defendant's address. Additional information provided by PayPal corroborated the information that the defendant has purchased services from Privax.

10.     Agents also obtained records from Google, for the gmail account associated with the defendant. The agent observed an e-mail conversation between the defendant and an individual using the e-mail address of buyddos@gmail.com. It was determined that buyddos@gmail.com was associated with an online provider for DDoS attacks. In one of the email conversations, the defendant asked how much it would cost to take down specified servers. The company advised Sharma that it depended on how long he would like a target to be offline and stated, "the more hours you order, the less the price can be."

11.     The records provided by Google included a list of IP addresses that the defendant used to check his gmail account. According to Charter Communications, these records were all associated with the defendant's parent's residence in La Cañada, California. During this period although he lived in student housing, the defendant's internet usage was through the Charter Communication account associated with his parent's address.

12.     Agents executed a search warrant at the defendant's residence. Agents interviewed the defendant, and he told them that he had read online posts from victims of DDoS attacks. He informed agents that he knew these types of attacks involved sending packets to interfere with someone's services. He was aware that the packets would be sent to an IP address that would be so overwhelmed with the packets that it would disrupt service. The defendant informed agents that he had conducted a test of his friend's website with his friend's permission. The defendant repeatedly told agents that he did not remember doing

any of these things, but that he could not remember a lot of what happened during that time frame because of abuse of prescription medication.

13.     Agents seized several of the defendant's electronic devices. A review of his Skype conversations showed that on July 6, 2013, the defendant discussed paying anuz.services, a known DDoS service provider, $100 to take down the anilinkz.com website. In another conversation, the defendant claimed responsibility for attacks on Chatango and Anilinkz. In January 2014, the defendant purchased a DDoS tool called Xtreme Fire and made several upgrades through December 2014. This tool was described by the website as a DDoS tool that provides "fully dedicated power that is not shared by any other user." Xtreme Fire was the most powerful tool available and was purchased using digital currencies and PayPal. The defendant agreed in his Plea Agreement that he purchased this tool to conduct the above described attack on Chatango and other companies.

14.     The investigation further revealed that in early 2015, the owner of Tenkai Networks reported being the victim of a DDoS attack. The owner of Tenakai Networks informed agents that on February 26, 2015, the company banned a user due to an infringement of the company's game network rules. After banning the user, the company received several messages. One of which stated the following:

> "Your server wont' lie the next month, you better go buy 10k per month ddos defense… This isn't the 1st-8th time I've been ordered to take down a hyperfilter server for the government or my own personal use."

15.     A few hours after Tenakai Networks received the above message, the company's servers were the target of multiple DDoS attacks. The company's online services were impaired to the point that they had to purchase a DDoS shield for protection.

16.     The defendant used the Xtreme Fire tool to conduct hundreds of unauthorized DDoS attacks against 43 victim companies in the United States and abroad from November 2014 through January 2015. As a result of the attacks, Chatango's Internet Service Providers were completely saturated with external communication requests, ultimately knocking the company's website offline, causing a loss of approximately $58,100.

17.     Additionally, the defendant purchased a DDoS tool through Netspoof.net. The defendant purchased the "Diamond Package," which allowed users to conduct attacks for up to 7200 seconds. The defendant agreed in his plea agreement that he used the tool he purchased through Netspoof.net to conduct attacks on 123 victims located throughout the United States and abroad. Between November 2013 and June 2014, the defendant conducted 1,166 attacks, through six accounts that he obtained through Netspoof.net which totaled approximately 77 days of interference. The defendant agreed that these attacks are relevant conduct.

**<u>Victim Impact</u>**

18.     The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. According to information provided by the government, Chatango suffered a loss

of $58,100 as a result of the attacks. The defendant has agreed to pay restitution of no less than this amount.

A Victim Impact Statement was received from the Founder and Chief Executive Officer of Chatango. The statement describes how the defendant's actions caused tangible and intangible losses to the founders of Chatango. The founder stated that during the attacks, Chatango employees were not able to work on the development of the company and rather had to focus on mitigating the attacks. Due to the magnitude of the attacks, the mitigation efforts took approximately two to three hours of daily work. The founder describes in his letter, how his personal vacations were spent with him working on how to mitigate the attacks. The founder also describes how he spent long days at the office trying to address the attacks, at times only sleeping two to three hours per night. The founder also noted how his personal health failed as a result of stress and exhaustion. Additionally, his co-founder left the company, due to the long days and the uncertainty about the company's future.

The complete Victim Impact Statement will be forwarded to the Court for review.

### Adjustment for Obstruction of Justice

19.   The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

20.   The defendant has not provided a statement of acceptance of responsibility.

### Offense Level Computation

21.   In accordance with the Supreme Court Decision in **United States v. Booker**, the following guideline calculations are no longer binding but advisory. Therefore, they must be considered by the sentencing court together with other sentencing goals. The current United States Sentencing Commission, 2016 Guidelines Manual, is being used as there are no ex post facto issues. USSG §1B1.11(a).

### Count 1: Transmission of a Program, Information, Code, and Command to Cause Damage to a Protected Computer

22.   **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1030(a)(5)(A) is USSG §2B1.1. The base offense level is six pursuant to USSG §2B1.1(a)(2).          **6**

23.   **Specific Offense Characteristics:** Pursuant to USSG §2B1.1(b)(1)(L), a six level increase is applicable if the loss amount exceeded $40,000 dollars. In this case, the defendant's activities caused approximately $58,100 in lost revenue. Therefore the increase is warranted.          **+6**

24.     **Specific Offense Characteristics:** Pursuant to USSG §2B1.1(b)(2)(A), if the offense involved more than 10 victims, a two level increase is applicable. In this case there were more than 10 victims. Therefore, the increase is warranted.       **+2**

25.     **Specific Offense Characteristics:** A four level increase is applicable because the defendant was convicted of a violation of 18 U.S.C. 1030(a)(5)(A).       **+4**

26.     **Victim Related Adjustment:** None.       **0**

27.     **Adjustment for Role in the Offense:** None.       **0**

28.     **Adjustment for Obstruction of Justice:** None.       **0**

29.     **Adjusted Offense Level (Subtotal):**       **18**

30.     **Chapter Four Enhancement:** None.       **0**

31.     **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).       **-2**

32.     **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).       **-1**

33.     **Total Offense Level:**       **15**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

34.     Pursuant to United States v. Booker, 125 S.Ct. 738 (2005), the Court should consider the following criminal history category calculation to be advisory.

### Juvenile Adjudication(s)

35.     None.

### Adult Criminal Conviction(s)

36.     None.

### Criminal History Computation

37.     The criminal convictions above result in a subtotal criminal history score of zero.

38.     The total criminal history score is zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

### Other Criminal Conduct

39.     None.

### Pending Charges

40.     None.

### Other Arrests

41.     None.

## PART C. OFFENDER CHARACTERISTICS

42.     The following information was provided by the defendant during the presentence investigation interview. Personal information provided by the defendant was verified with his wife and his father.

### Personal and Family Data

43.     The defendant was born in Pasadena, California, to the marital relationship of Ashok K. Sharma (age 68) and Laurie J. Sharma (nee: Nakamaru)(age 62). The defendant explained that his parents' marriage remains intact and estimated that they have been married approximately 40 years. The defendant's father worked for thirty years as an anesthesiologist and is currently working as a property manager of several apartment buildings that he owns. The defendant's mother is retired from nursing and currently assists his father in real estate. The defendant has three sisters: Tara Sharma (age 32), who resides in Cleveland, Ohio, and is employed as a neurologist; Marisa Sharma (age 31), who resides in Long Beach, California, and is employed as an artist; and Shashi Sharmi, who passed away at birth. The defendant was born and raised in the Pasadena area, with the exception of three years, when he lived in Salem, Oregon to attend college.

Re:  Sharma, Sean (3128133)                                                                Page 9

44.     The defendant described a good childhood, noting that his parents were wealthy and his
        material needs were always met. As a child, the defendant benefitted from the support of
        his parents and participated in extracurricular activities. He stated that he played soccer
        and participated in karate between the ages of five and twelve. Between the ages of 13
        and 21, the defendant was a member of the cross-country and track and field teams. He
        explained that he ran throughout middle school, high school and for his freshman year of
        college.

45.     The defendant noted no history of abuse or neglect, but noted that the death of his
        grandfather was difficult for him. Sharma noted that his grandfather helped care for him
        and attended his sporting events. The defendant's grandfather passed away after suffering
        from Alzheimer's disease and due to general aging health problems. The defendant was
        16 years old when his grandfather died and was comforted by his parents.

46.     Sharma described a close relationship with his family. He noted that they are aware of his
        involvement in the instant offense and have provided financial and emotional support to
        him. His parents have also helped him with transportation to his court appearances and
        medical appointments. He noted that throughout high school, he was mostly friends with
        the members of his sports team. However, he noted that he does not maintain any of those
        friendships today and that he decided to focus on his family and career. He currently
        spends his free time exercising, studying web development skills, watching television and
        playing video games.

47.     On June 27, 2017, the defendant married Andrea Sharma in La Cañada, California. The
        defendant met his wife on the internet, when they were both playing video games. He
        indicated that they decided to meet in person and his wife, who was from Southern
        California, but living in Florida, moved in with the defendant and his parents. The
        defendant described this as a good relationship and described them as partners who do
        everything together. He noted that they plan to stay in a relationship and that the instant
        offense has not affected their marriage. He noted that his wife is sad and is worried about
        the outcome of his case, but remains supportive of him. The defendant's wife is currently
        unemployed, but was previously working as a massage therapist. Sharma noted that she
        may go to school for nursing in the future and wants to obtain employment after he is
        sentenced. In the past the defendant's wife had a history of depression and became
        addicted to anxiety pills. He explained that she went to therapy for this addiction and has
        not used any pills in over a year.

48.     Earlier this year, the defendant's wife delivered a stillborn baby girl at seven months. He
        noted that this was a very traumatic experience and that they have not had time to focus
        on it much. He noted that they have been focusing on work and his pending court case.

49.     The defendant and his wife currently live with his parents. An internet search of the
        property revealed a large Mediterranean style home, with a gated entrance. According to
        Zillow, the home has eleven bedrooms, eight bathrooms and approximately 6,200 square
        feet. The home is valued at approximately $5,584,447.00. The defendant noted that they
        plan to remain in this home and that if he is incarcerated, his wife will likely remain in
        the home with his parents.

50.     In the future, the defendant hopes to work in freelance web development and possibly build his own web development company. He noted that he hopes to have a family in the future and feels that the support he receives from his family will help him to overcome future obstacles, such as his potential incarceration and his felony conviction.

## Physical Condition

51.     The defendant is a 26 year-old male, who stands 5'5" tall and weighs 160 pounds. He has brown eyes and black hair. The defendant has a scar on his left ankle from when he was cut while surfing. The defendant has a partial tattoo of a Koi fish on his left arm. He is in the process of having the tattoo removed.

52.     The defendant struggles with ongoing staph infections. He explained that he often has white bumps near his scrotum, which turn into infected boils. He explained that he treats this with an antibiotic ointment. He noted that he does well on antibiotics, however, the infection has returned two or three times.  In March 2017, the defendant was hospitalized for one week as a result of the infection. In order to treat the problem, the doctor had to make an incision and drain the abscess. The defendant also suffers from a sleep disorder and frequent urination.

53.     After his release from the detox center at the Glendale Adventist Alcohol and Drug Center, Mr. Sharma sought treatment from, and is currently seeing Dr. Christian Rutland, a specialist in psychiatry and certified in addiction medicine.

54.     The defendant is currently prescribed Doxepin (50mg per day) for sleep; Amoxicillin (500mg per day) for acne and Bactrim (2 tablets per day) as needed for the staph infection. The defendant is trying different sleep medications to see what will work well for him and is currently taking Belsomra and Rozerem. The defendant is allergic to walnuts.

55.     The undersigned spoke with the defendant's father, who corroborated the above information. He noted that the defendant was hospitalized for the above described infection for one week and that a microbiology report showed that the defendant had Methicillin-Resistant Staphylococcus-aureus (MRSA). The defendant treats this condition with Bactrim, which is the only antibiotic that will work. The defendant's father explained that he is resistant to all other antibiotics and that if he becomes resistant to Bactrim, he will need to see an infectious disease specialist, as this is a life-threatening condition. The defendant is currently seeking an appointment with an infectious disease specialist.

## Mental and Emotional Health

56.     Sharma reported suffering from social anxiety for his whole life. He explained that when he was 22 years old, he broke his ankle and returned home from college. He noted that he was on bed rest and not doing much else with his time and he started thinking about other issues. The defendant recalled feeling a lot of anxiety. He noted that he was struggling because of the anxiety. He remembered staying up all night and suffering from memory

loss and irritability. The defendant noted that his anxiety was generalized and was about everything.

57.    While the defendant was a student at Willamette University, he participated in counseling services through the University. Those records indicate that the defendant enrolled in counseling after feeling depressed following his broken ankle. Records from his counseling session indicated that he was taking a variety of anti-depressants and sleep medications. The counseling notes also indicated that the defendant's father was prescribing some of his medication for him.

58.    Starting in 2011, he received treatment through the San Marino Psychiatric Associates. One of the defendant's session with the Psychiatrist notes that in March of 2011, the defendant attempted suicide by overdosing on Tylenol. He noted that his suicide attempts were a reaction to rejection from women that he was dating. The defendant was diagnosed with Major Depression.

59.    The defendant began taking Cymbalta around the same time that he broke his ankle. He indicated that he had a bad reaction to it and then switched to Xanax. Sharma believes that he became addicted to the Xanax and that he took extra pills when he felt anxious. Sharma reported switching to Klonopin in order to wean himself off of Xanax. For approximately three years he regularly used Klonopin. The defendant reported that he initially stopped using Klonopin "cold turkey" and had very bad withdrawal symptoms. When he weaned himself off the medication slowly, he did well. When the defendant was taking Klonopin, he noted that he was agitated and sensitive to antagonization. The defendant further stated that he felt paranoid and lost his sense of reality.

60.    The defendant's father stated that in his opinion, the defendant was addicted to sleep drugs, which led to his addiction to prescription medications and mania, which led to his involvement in the instant offense. He noted that while the defendant was away at school, the defendant could not sleep and sent his father text messages throughout the night. Sharma's father described his behavior as "manic" and recalled one incident, when he was driving and tried to talk to Sharma about how much money Sharma was spending. He noted that Sharma became angry and tried to grab the steering wheel while he was driving the car, which almost caused his father to crash the vehicle.

61.    The defendant provided many of his medical records. In 2014, the defendant underwent a sleep study after he reported having difficulty sleeping due to feeling sad at bedtime, having nightmares and thoughts of suicide. As a result of this study, it was recommended that he see a psychiatrist and other sleep measures such as avoiding alcohol and establishing a bedtime routine.

## Substance Abuse

62.    The defendant estimated that he uses alcohol approximately once a month. He denied any regular drug use and noted that he has no current substance abuse problems.

63.    The day after his graduation from college, the defendant went to a residential treatment program at the Glendale Adventist Medical Center to address his addiction to Klonopin.

From April 30, 2015 to June 2015, the defendant completed both a residential and an outpatient treatment program. The defendant explained that he has not used any drugs since starting the rehabilitation program.

64.     Sharma noted that he is currently under the supervision of U.S. Pretrial Services in the Central District of California and has submitted several negative drug tests while on supervision.

**Educational, Vocational and Special Skills**

65.     The defendant graduated from La Cañada High School, in La Cañada, California, in 2009 (verified). From 2009 until 2012, he attended classes at Willamete University, in Salem, Oregon. In 2012, he transferred to the University of Southern California, where he earned a Bachelor's Degree of Science and a Master's Degree of Science in 2017 (verified).

66.     The defendant speaks English and no other languages. He noted that he did well in school and sometimes struggled when he was participating in sports. He noted that he focused only on running and not on his academics. The defendant struggled socially at times in school. He explained that he suffered from social anxiety and was often made fun of for being quiet. He recalled being too anxious to talk in class and would wonder if he was saying the right thing because other kids would tease him.

67.     Sharma participated in karate for approximately eight years and earned a black belt and some trophies from tournaments that he competed in. The defendant also has specialized computer skills from his studies in the computer science field.

**Employment Record**

68.     The defendant noted that he is currently unemployed, as he has primarily been a student. The defendant opened a web development company called Krys Towers, which focuses on the creation of websites and other Internet related content for individuals and small businesses.

69.     For approximately three months in 2012, the defendant worked as an intern in the Jet Propulsion Laboratory at NASA. He noted that he was paid $6,000 for a ten week internship.

**Financial Condition: Ability to Pay**

70.     The defendant completed the Probation Net Worth Statement and the Monthly Cash Flow Sheet.

**Assets**

| | | |
|---|---|---:|
| Personal Checking Account | Bank of America | $424.26 |
| Personal Savings Account | Bank of America | $4.53 |
| **Total Assets** | | **$428.79** |

**Liabilities**

| | | |
|---|---|---:|
| Credit Card | Capital One | $8,580.96 |
| Credit Card | Bank of America | $7,314.00 |
| Credit Card | Chase | $6,989.83 |
| Personal Loans | Student Loans | $111,129.00 |
| Personal Loans | Student Loans | $147,588.00 |
| **Total Liabilities** | | **$281,601.79** |
| **Total Net Worth** | | **($281,173)** |
| **Total Monthly Cash Flow** | | **$0** |

71.    The defendant noted that he has no income. He currently resides with his parents and they pay all of the household bills, as well as his credit card bills and student loans.

**Analysis**

72.    The defendant has no assets and no source of income. It appears as though he is fully supported by his parents. The defendant does not appear to have the ability to pay a fine.

## PART D. SENTENCING OPTIONS

73.    Pursuant to United States v. Booker, 125 S.Ct. 738 (2005), the Court should consider the following guideline provisions to be advisory.

**Custody**

74.    **Statutory Provisions:** The maximum term of imprisonment on Count 1 is 10 years. 18 U.S.C. § 1030(a)(5)(A). This offense is a Class C felony. 18 U.S.C. § 3559(a)(3).

75.    **Guideline Provisions:** Based upon a total offense level of 15 and a criminal history category of I, the guideline imprisonment range is 18 months to 24 months. Because the guideline range falls into Zone D of the Sentencing Table, the minimum term must be satisfied by a sentence of imprisonment. USSG §5C1.1(f).

## Supervised Release

76. **Statutory Provisions:** The Court may impose a term of supervised release of not more than three years on Count 1. 18 U.S.C. § 3583(b)(2). The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance. The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release to supervision and 2 periodic drug tests thereafter for use of a controlled substance, pursuant to United States v. Antonio D. Stephens, 424 F. 3d 876 (9th Cir. 2005). The court shall order as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such sample is authorized pursuant to the revised DNA collection requirements under the Justice for All Act of 2004. The court may further order any other condition it deems appropriate. 18 U.S.C. § 3583(d).

77. **Guideline Provisions:** Since the offense for Count 1 is a Class C Felony, the guideline range for a term of supervised release is 1 year to 3 years. USSG §5D1.2(a)(2). The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance. The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release to supervision and 2 periodic drug tests thereafter for use of a controlled substance, pursuant to United States v. Antonio D. Stephens, 424 F. 3d 876 (9th Cir. 2005). The court shall order as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such sample is authorized pursuant to the revised DNA collection requirements under the Justice for All Act of 2004. The court may further order any other condition it deems appropriate. 18 U.S.C. § 3583(d)

## Probation

78. **Statutory Provisions:**  The defendant is eligible for not less than one nor more than five years probation because the offense is a Class C Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. 18 USC § 3563(a)(2).

79. **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

## Fines

80. **Statutory Provisions:**  The maximum fine is $250,000. 18 U.S.C. § 3571(b).

81. A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

82.   **Guideline Provisions:** The fine range for this offense is from $4,000 to $40,000. USSG §§5E1.2(c)(3) and (h)(1).

83.   Costs of prosecution shall be imposed on the defendant as required by statute. USSG 5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed. USSG 5E1.2(d)(7) and 18 U.S.C. 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated June 24, 2016, provides the following monthly cost data:

|  | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $88.00 | $71.00 | $11.00 |
| Monthly | $2,665.00 | $2,174.00 | $341.00 |
| Annually | $31,976.00 | $26,083.00 | $4,097.00 |

### Restitution

84.   **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $ shall be ordered in this case. Restitution, as set forth below, is due and owing to the following victims:

85.   **Guideline Provisions:** In the case of an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss, if such order is authorized under 18 U.S.C. § 1593, § 2248, §2259, § 2264, §2327, § 3663, or § 3663A, or 21 U.S.C. § 853(q). USSG §5E1.1(a)(1).

### Forfeiture

86.   **Statutory Provisions:**  Forfeiture is to be imposed upon a convicted defendant pursuant to 21 U.S.C. § 853.

87.   **Guideline Provisions:** Forfeiture is to be imposed upon a convicted defendant as provided by statute. USSG § 5E1.4.

### Denial of Federal Benefits

88.   **Statutory Provisions:** None.

89.   **Guideline Provisions:** None.

Re:  Sharma, Sean (3128133)                                                                          Page 16

**PART E. FACTORS THAT MAY WARRANT DEPARTURE**

90.     The probation officer has not identified any factors that would warrant a departure from
        the applicable sentencing guideline range.

**PART F. FACTORS THAT MAY WARRANT A SENTENCE OUTSIDE OF THE
        ADVISORY GUIDELINE SYSTEM**

91.     The probation officer has not identified any factors that would warrant a sentence outside
        the applicable advisory guideline range.


                                        Respectfully Submitted,

                                        Yador J. Harrell
                                        Chief U.S. Probation Officer



                                        _____
                                        By:  Emily P. Libby
                                                 U.S. Probation Officer Specialist



Approved:



_____
Joshua D. Sparks
Supervisory U.S. Probation Officer

**ADDENDUM TO THE PRESENCE REPORT**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**UNITED STATES V. SEAN KRISHANMAKOTO SHARMA, DKT. 0971 3:16CR00484-**
**001 CRB**

The United States Probation Officer certifies that the presentence investigation report, including any revisions thereof and this addendum, has been disclosed to the defendant's counsel for discussion with the defendant, and to counsel for the Government, pursuant to Crim. L.R. 32-5 and FRCrimP 32(g).

## OBJECTIONS

### By the Government

1.    A written response has been received from the Government, which is in compliance with Crim. L.R. 32-4(b) and (c). All objections to the presentence report have been resolved.

### By the Defendant

2.    A written response has been received from the defense counsel, which is in compliance with Crim. L.R. 32-4(b) and (c). All objections to the presentence report have been resolved.

Respectfully Submitted,

Yador J. Harrell
Chief U.S. Probation Officer

By:  Emily P. Libby
        U.S. Probation Officer Specialist

Approved:

Joshua D. Sparks
Supervisory U.S. Probation Officer

## SENTENCING RECOMMENDATION

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### UNITED STATES V. SEAN KRISHANMAKOTO SHARMA, DKT. 3:16CR00484-1 CRB

**TOTAL OFFENSE LEVEL**                          15
**CRIMINAL HISTORY CATEGORY**             I

|  | **Statutory Provisions** | **Guideline Provisions** | **Recommended Sentence** |
|---|---|---|---|
| **CUSTODY:** | Ct. 1: 10 years | 18 to 24 months | 18 months |
| **SUPERVISED RELEASE:** | Ct. 1: 1 to 3 years | Ct. 1: 1 to 3 years | 3 years |
| **PROBATION:** | 1 to 5 years | Ineligible | Not Applicable |
| **FINE:** | Ct. 1: $250,000 | $4,000-$40,000 | Waived |
| **RESTITUTION:** | Not applicable | Not applicable | To be determined by the Court in an amount no less than $58,100 |
| **SPECIAL ASSESSMENT:** | Ct. 1: $100 | Ct. 1: $100 | Ct. 1: $100 |

<u>**Justification:**</u>

The defendant appears before the Court for sentencing after pleading guilty to Transmission of a Program, Information, Code, and Command to Cause Damage to a Protected Computer. The defendant is responsible for conducting numerous Denial of Service (DDoS) attacks on various websites. This type of computer attack causes a large amount of traffic to be sent to a website, which overwhelms the server and causes the site to shut down. The defendant purchased two different tools in order to conduct these attacks and used them to conduct over 1,000 attacks on victims in the United States and abroad.

Sharma has no prior arrests or criminal convictions.

Sharma was raised in La Cañada, California, which is near Pasadena, California, by both of his parents. The defendant enjoyed a good childhood, in a home that was free from abuse and neglect. His father was a doctor, and his mother was a nurse. Sharma described his family as wealthy and noted that his material needs were always met. The defendant's parents described

him as a "shy" child, who sometimes struggled socially. Sharma did not recall any trauma in his childhood, although he noted that he had a difficult time dealing with his grandfather's death.

When Sharma was 22 years old, he began to struggle with depression and anxiety. He recalled times when he was not able to sleep and that he was up all night due to anxiety. In an effort to treat his depression and anxiety, the defendant went to several different doctors and tried several different psychiatric medications. The defendant explained that he became addicted to these medications and took more than he was prescribed. Sharma also described side effects of the medications and noted that he was agitated, paranoid and lost his sense of reality.

Sharma also continues to struggle with poor physical health, specifically, with re-occurring staph infections. The defendant explained that he has developed boils, which quickly turn into a serious infection and that he has been hospitalized for this condition in the past. The defendant noted that should this re-occur, it could very quickly turn into a life threatening infection.

Pursuant to 18 U.S.C. § 3553(a), the Court may consider a variety of factors in determining an appropriate sentence for the defendant. The Court may consider the personal history and characteristics of the defendant. This defendant was raised in an idyllic environment. Although his parents worked long hours, which took them out of the home, they were both available to the defendant. He was provided with constant care, ongoing emotional and financial support from his parents and a good education. When the defendant faced struggles in life, such as his addiction to prescription medications, his parents provided him with opportunities. His parents have been very active in his medical care and sent the defendant to residential treatment to address his past addiction problems. The defendant and his wife continue to reside with his parents and they continue to support him financially. The defendant has never served a custodial sentence and it is likely that any custody time will have a significant impact on this defendant. Therefore, a lengthy sentence is not necessary to deter this defendant from future criminal conduct.

Despite an overwhelming amount of support, the defendant engaged in the instant offense. The Court must also consider the nature and circumstances of the offense. The defendant's actions were significant. The defendant first engaged in the attacks using a tool purchased through Netspoof.net in November 2013. In January of 2014, he purchased a second tool, Xtreme Fire, to conduct the same type of attacks. The defendant began using Xtreme Fire in November of 2014, to conduct more attacks. His actions required significant planning. Additionally, the defendant is responsible for over a thousand attacks. These attacks caused significant damage to several companies as noted in the Victim Impact Statement received from Chatango. In order to reflect the seriousness of his actions and to send a message of general deterrence, a custodial sentence is warranted. The most significant mitigating factor is the defendant's physical health. The undersigned acknowledges that his history of serious infections is concerning, however, the Bureau of Prisons is likely able to address his medical needs.

Based on all of the sentencing factors, it appears that a low end guideline sentence of 18 months is sufficient but not greater than necessary to address the goals of sentencing. Following any term of incarceration, it is recommended that the defendant be placed on supervised release for a period of 3 years. Based on his history of depression and anxiety, a mental health treatment condition is recommended.  The defendant denied any current substance abuse problems.

However, based on his need for psychotropic medication, history of addiction and his use of alcohol as a sleep aid in the past, it is recommended that he abstain from the use of alcoholic beverages. The defendant is required to submit to DNA testing and is subject to a $100 special assessment. Based on the nature and circumstances of the offense, it is recommended that the defendant be subject to computer monitoring, computer restrictions and computer searching. The defendant has agreed to pay restitution of no less than $58,100. Because of this obligation, it is recommended that he not incur any new debt without the prior approval of probation and that he provide probation with all requested financial information. As part of his Plea Agreement, the defendant agreed to an expanded search condition, which includes electronic devices.

While incarcerated, it appears that the defendant would benefit from mental health treatment and will likely need to be designated to a facility that is able to provide him with medical care.

**Voluntary Surrender:**

It appears the defendant is a person whose release is not restricted under 18 U.S.C. §3143. The defendant has kept all court appearances, complied with conditions of pretrial release, and is not viewed as a flight risk or a danger to the community.  Therefore, the defendant is considered to be a good candidate for voluntary surrender.

**Recommendation**

It is respectfully recommended that sentence in this case be imposed as follows:

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Sean Sharma is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 18 months.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall not commit another Federal, State or local crime, shall comply with the standard conditions that have been adopted by this court, shall refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and 2 periodic drug tests thereafter, and shall comply with the following conditions:

**Recommendation**

1.      You shall not possess or use a computer without the prior approval of the probation officer. "Computer" includes any electronic device capable of accessing the internet or processing or storing data as described at 18 U.S.C. § 1030(e)(1)(including cell phones), and all peripheral devices.

2.      You shall not access the Internet or any "on-line computer service" at any location (including employment) without the prior approval of the probation officer. "On-line

Re:  Sharma, Sean (3128133)                                                                    Page 4

services" include any Internet service provider, or any other public or private computer network. As directed by the probation officer, you shall warn your employer of restrictions to your computer use.

3.      You shall pay any restitution and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

4.      You shall not open any new lines of credit and/or incur new debt without the prior permission of the probation officer.

5.      You shall provide the probation officer with access to any financial information, including tax returns, and shall authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

6.      You shall participate in a mental health treatment program, as directed by the probation officer. You are to pay part or all cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of mental health counseling. The actual co-payment schedule shall be determined by the probation officer.

7.      You shall cooperate in the collection of DNA as directed by the probation officer.

8.      You shall submit your person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), or any property under your control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state or local law enforcement officer at any time with or without suspicion. Failure to submit to such a search may be grounds for revocation; you shall warn any residents that the premises may be subject to searches.

9.      As directed by the probation officer, you shall enroll in the probation office's Computer and Internet Monitoring Program (CIMP) and shall abide by the requirements of the CIMP program and the Acceptable Use Contract.

10.     You shall consent to the probation officer conducting periodic unannounced examinations of your computer equipment which may include retrieval and copying of all data from your computer(s) and any peripheral device to ensure compliance with this condition, and/or removal of any such equipment for the purpose of conducting more thorough inspection. You shall also consent to the installation of any hardware or software as directed by the probation officer to monitor your Internet use.

11.     You shall not possess or use any data encryption technique or program.

12.     You shall abstain from the use of all alcoholic beverages.

It is further ordered that the defendant shall pay to the United States a special assessment of $100. Payments shall be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.   During imprisonment, payment of criminal monetary

Re:  Sharma, Sean (3128133)                                                                Page 5

penalties are due at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

The Court finds the defendant does not have the ability to pay the fine and orders it waived.

It is further ordered that the defendant shall pay restitution to Chatango, in and amount to be determined by the Court, but no less than $58,100. During imprisonment, payment of restitution is due at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.  Once the defendant is on supervised release, restitution must be paid in monthly payments of not less than $200 or at least 10 percent of earnings, whichever is greater, to commence no later than 60 days from placement on supervision. Any established payment plan does not preclude enforcement efforts by the US Attorney's Office if the defendant has the ability to pay more than the minimum due. The restitution payments shall be made to the Clerk of U.S. District Court, Attention: Financial Unit, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102

**<u>Forfeiture</u>**

The defendant's interest in the following property shall be forfeited to the United States:  a Black Sony Vaio (S/N 54524118) and an Alienware Laptop with Cord (S/N JQ7SD12).

Respectfully Submitted,

Yador J. Harrell
Chief U.S. Probation Officer

By:  Emily P. Libby
         U.S. Probation Officer Specialist

Approved:

Joshua D. Sparks
Supervisory U.S. Probation Officer